R.A. CULLINAN AND SONS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (William L. Cooper, Jr., Appellee).

Third District (Industrial Commission Division)    No. 3—90—0684WC

Opinion filed July 30, 1991.

Patrick W. Martin, of Quinn, Johnston, Henderson & Pretorius, of Peoria, for appellant.

Jeffrey B. Rock, of Hasselberg & Rock, of Peoria, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant, William L. Cooper, Jr., filed an application for adjustment of claim following an altercation with a co-worker in which head, neck, shoulder and back injuries were sustained during the course of his employment with R.A. Cullinan & Sons. Claimant filed a petition for immediate hearing pursuant to section 19(b—1) of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.19) seeking temporary total disability and medical benefits. The arbitrator found that claimant initiated the altercation and denied his claim. Upon review the Industrial Commission (Commission) reversed the decision of the arbitrator, holding that the altercation was instigated by

claimant's co-worker, and awarded him temporary total disability benefits in the amount of $554.27 per week for a period of 31⁴/₇ weeks, and $4,921.49 for necessary medical expenses. The circuit court of Tazewell County confirmed the decision of the Commission. Employer appeals.

Claimant, age 40, was employed as a truck driver hauling dirt in an earth-moving truck for road construction. Claimant worked approximately 58 hours per week from September 1987 until the onset of inclement weather in the last part of November 1987, earning between $16 and $18 per hour. Claimant had no other employment between the time he stopped working for employer in the previous working season until he began again in April 1988. Claimant testified that he again worked 58 hours per week during the current construction season.

On April 21, 1988, claimant was working in a borrow pit. As he left the pit at 7 a.m. with his truck loaded with dirt, he passed his co-worker, Ralph Black, who was also driving a truck. According to claimant, Black refused to yield the right-of-way to his loaded truck, and claimant had to slow down and move over to the side of the road as Black passed by him. No words were exchanged at that time. (Claimant indicated that he had no previous problems with Black.)

Approximately 10 minutes later, claimant again encountered Black as he continued into the site to unload his truck. Black stopped his truck in the middle of the road, thereby preventing claimant from crossing the road, and made an obscene gesture.

Claimant reported the incident to his foreman, Luther Leesman, and requested his assistance as he could not continue working under such conditions. Later that day, he found Black waiting for him at the exit to the pit. Black ordered him to pull his truck into a parking area so that he could talk to claimant. As claimant left his truck, Black entered the parking area and pulled to the right of his truck.

Claimant further testified that Black approached him and appeared to be concealing something in his right hand. When Black was approximately two feet in front of claimant, he threatened to kill claimant. At that moment, Black produced a 20-inch steel pipe. Claimant attempted to block the blow with his left hand, but the pipe struck him along the left eye and temple. Claimant then struck Black and wrestled him to the ground in an attempt to get the pipe away from him; however, he was struck in the head several more times. Eventually he was able to wrestle the pipe away from Black. He positioned the pipe over Black's throat and chest and held Black to the ground. Leesman drove into the parking area and ordered claimant to

get off Black and get rid of the pipe.

Leesman testified that claimant had spoken to him about Black's actions. Leesman attempted to talk to Black about it, but Black was too angry to talk to Leesman. Black just stated that he would do something about it. Leesman further testified that as he came upon the scene, he found claimant and Black on the ground in front of their trucks. Both claimant and Black were bleeding from abrasions and lacerations to the head. According to Leesman, claimant "looked like he was going to collapse, *** weak-kneed *** shaky from shock" and speaking in incoherent phrases. (Claimant and Black were terminated as a result of this incident; however, claimant was reinstated after filing a grievance hearing with the union.) Black did not seek reinstatement.

Black testified that claimant made an obscene gesture at him through the windshield of his truck while they were in the borrow pit. Leesman confronted him with claimant's accusation that Black had run him off the road. Black informed Leesman that the opposite had occurred and that claimant had tried to run him off the road.

Black further testified that he motioned for claimant to pull into the parking area, and that he came out of his truck carrying the short metal pipe beside his right leg because he did not know what he would encounter when he met claimant. (Claimant weighed approximately 295 pounds, while Black weighed 170 pounds.) According to Black, claimant struck the first blow with his fist near Black's right eye, and they both went down on the ground. Black testified that claimant tried to gouge his right eye out with his thumb and threatened to kill him. Black received 11 stitches as a result of the altercation. Black stated that claimant had never previously threatened him or anyone else on the jobsite.

Claimant testified that upon his arrival in the hospital emergency room he was scared, extremely disoriented, and on the verge of losing consciousness. Claimant sustained multiple contusions and received several stitches in the back of his head for lacerations. A CT scan revealed no intracranial abnormalities. After the altercation, claimant complained of problems with headaches, blurred vision, confusion, depression, shoulder and low back pain.

Claimant's wife testified that since the accident, claimant has experienced slight memory loss at different times; he forgets things and sleeps a lot as a result of his medication.

On April 22, 1988, claimant was treated by Dr. William Baisier. Dr. Baisier opined that claimant suffered mostly from soft tissue injury, and diagnosed his condition as a contusion and sprain of the cer-

vical and lumbosacral spine, and headaches.

On May 13, 1988, claimant was examined by Dr. Edward Trudeau upon Dr. Baisier's referral. The electrodiagnostic tests Dr. Trudeau performed on claimant were normal. Dr. Trudeau potentially diagnosed claimant's condition as post-traumatic cervical syndrome or post-concussion syndrome. Dr. Trudeau further testified that although the electrodiagnostic tests were normal, it does not preclude claimant from suffering from either of the aforementioned conditions. Post-traumatic cervical syndrome and post-concussion syndrome can be caused by one or several blows to the head or neck region; further, both of these conditions can occur simultaneously.

Dr. Baisier referred claimant to Dr. Betsill for headache treatment. On May 10, 1988, Dr. Betsill found no evidence of significant neurologic injury and diagnosed claimant's condition as post-traumatic headache. On June 15, 1988, Dr. Betsill recommended a psychiatric evaluation by Dr. Bornstein for his complaints of depression.

Mr. Kenneth Imhoff, a clinical psychological tester, examined claimant on August 3, 1988, at the request of Dr. Bornstein. Imhoff holds bachelor's and master's degrees in psychology and had been performing psychological testing since 1969.

Imhoff administered a battery of standard psychological and intelligence tests. Imhoff opined that claimant had a dual handicap, with the primary diagnosis as organic brain syndrome and the secondary diagnosis as marked depression and anxiety. According to Imhoff, the injuries sustained by claimant during the altercation with Black had a direct relationship to his organic brain syndrome. Imhoff stated that he believed that claimant was sincere in his effort during the tests. Imhoff further stated that it was doubtful that claimant would return to work as a truck driver because of his inadequate spatial relationship skills.

Dr. Gregg Helgeson, a counseling psychologist, reviewed for the employer claimant's medical records, the tests conducted by Imhoff, the medical reports of Drs. Trudeau and Baisier, as well as claimant's junior high school grades. Dr. Helgeson opined that the results are inconclusive as to whether claimant suffered brain impairment. He found that claimant appears to be functioning at the same level of performance as he did in seventh, eighth and ninth grades, and that he did not have a higher premorbid I.Q. It was his opinion that claimant was not suffering from either post-concussion or post-traumatic cervical syndrome.

The arbitrator concluded claimant failed to prove that his injuries arose out of and in the course of his employment. The arbitrator

based his decision on his finding that claimant was the aggressor in the fight with Black. The Commission reversed the decision of the arbitrator, concluding that Black was the aggressor and that claimant's injuries arose out of and in the course of his employment.

On appeal, employer argues that the Commission did not have jurisdiction because it failed to render its written decision within the time period set forth in section 7020.80(D) of the Illinois Administrative Code (50 Ill. Adm. Code §7020.80(b)(4)(D) (Supp. 1986)). Employer also maintains that the Commission's decision finding that claimant was not the aggressor in the altercation, and that claimant's condition of ill-being was the result of the work-related accident, is against the manifest weight of the evidence. Employer also contends that claimant's weekly wage was erroneously computed.

■ We turn first to employer's contention that the Commission did not have jurisdiction because it failed to render its written decision in a timely manner as provided by section 7020.80(D) of the Illinois Administrative Code. That section provides in relevant part:

> "(D) The Commission *shall* file its decision no more than 90 days after the filing of the Petition for Review, and not later than 180 days from the filing of the Petition under Section 19(b—), whichever is sooner." (Emphasis added.) 50 Ill. Adm. Code §7020.80(b)(4)(D), at 1436 (Supp. 1986).

Claimant filed the petition for immediate hearing with the Commission pursuant to section 19(b—1) on February 21, 1989. The predecision memorandum was issued by the Commission on October 11, 1989, followed by the entry of the full decision on December 29, 1989. Thus, employer contends that the Commission's failure to comply with its own regulations and file its decision within 180 days after the filing of the petition renders its decision invalid.

This court has recently analyzed the language of section 7020.80(D) in *Nelson v. Industrial Comm'n* (1990), 194 Ill. App. 3d 10, 550 N.E.2d 1047. We held that the time limits for rendering a decision on a workers' compensation claim are "directory" rather than "mandatory," and thus, the Commission does not lose its jurisdiction to modify the arbitrator's award by failing to enter a written decision within the statutory time period. In addition, the *Nelson* court found no evidence in the record suggesting that the Commission's actions were intended to be dilatory, or that the claimant suffered any injury due to the 15-day delay in filing the Commission's written decision.

Similarly, in *Orkin Pest Control v. Industrial Comm'n* (1989), 187 Ill. App. 3d 269, 543 N.E.2d 149, this court was presented with the issue of whether the Commission would lose jurisdiction when a deci-

sion and opinion on review were entered 209 days after claimant filed a petition for immediate hearing. After considering the sudden death of the arbitrator, and the failure of the employer to posit any evidence that it was injured in any way by that delay, this court found that an extended delay did not warrant reversal.

We apply the principles set forth in *Nelson* and *Orkin Pest Control* in the resolution of the issue in the present case. We do not find that the 249-day delay in the Commission's entry of its decision on December 29, 1989, constitutes dilatory tactics, in itself, sufficient to warrant a denial of jurisdiction. Any ruling that the deadlines are mandatory could well deprive both employers and employees of the right to Commission review of decisions of the arbitrators through mere inaction, however, legitimate or inadvertent. (*Nelson,* 194 Ill. App. 3d at 17, 550 N.E.2d at 1051.) Moreover, employer has failed to submit any evidence that the delay occasioned by the Commission caused it any injury.

■ Employer next asserts that the Commission's decision finding that claimant was not the aggressor in the fight with Black was against the manifest weight of the evidence. Injuries occasioned by an assault by a co-employee in the work place during work hours are compensable in Illinois if the assault arose in the course of a dispute involving the conduct of the work, provided that the claimant is not the aggressor. *Rodriguez v. Industrial Comm'n* (1983), 95 Ill. 2d 166, 447 N.E.2d 186, citing *Ford Motor Co. v. Industrial Comm'n* (1980), 78 Ill. 2d 260, 399 N.E.2d 1280.

In determining whether the claimant has met his burden of proof on an issue, the Commission is not bound by the arbitrator's findings and may properly determine the credibility of witnesses, weigh their testimony and assess the weight to be given to the evidence. *Anderson Clayton Foods v. Industrial Comm'n* (1988) 171 Ill. App. 3d 457, 526 N.E.2d 844, citing *Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364.

After claimant initially encountered Black, he reported the incident to Leesman and requested his assistance. Black told claimant to drive into the parking area, and left his truck concealing a 20-inch steel pipe; conversely, claimant was not carrying any type of weapon. Claimant testified that Black threatened to kill him and struck the first blow. We also note that claimant filed a grievance hearing after he was terminated as a result of the fight and received reinstatement.

It is well established that if undisputed facts upon any issue permit more than one reasonable inference, the determination of such issues presents a question of fact, and the conclusion of the Commission

will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52, 541 N.E.2d 665.) We will not discard permissible inferences drawn by the Commission based upon competent evidence merely because other inferences might be drawn by us. *Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.

Upon careful review of the record, we find ample support for the Commission's determination that Black struck the first blow and that claimant was not the aggressor in the altercation.

■■ Employer also contends that there is no causal connection between claimant's condition of ill-being and the work-related accident.

During the altercation, claimant was struck in the head approximately five or six times with a 20-inch steel pipe. Leesman testified that when he arrived in the parking area immediately following the fight, claimant appeared to be on the verge of collapse; that he was shaky from shock and spoke incoherently. Claimant sustained multiple contusions and received several stitches in the back of his head for lacerations sustained during the course of the fight, and complained of problems with headaches, blurred vision and confusion. Shortly after the incident, Dr. Betsill diagnosed claimant's condition as post-traumatic headache. In addition, claimant's wife testified that her husband has experienced bouts of slight memory loss at different times since the injury.

The Commission evaluated the medical testimony of Dr. Trudeau, who diagnosed claimant's condition as post-traumatic or post-concussion syndrome. Employer contends that claimant could not have post-concussion syndrome because he was not diagnosed as having a concussion when he was initially seen in the emergency room. However, Dr. Trudeau opined that claimant could be suffering from either of those conditions in view of the severe blows he sustained to his head, despite the normal results of the electrodiagnostic tests.

Imhoff, who performed psychological testing on claimant, diagnosed his condition as organic brain syndrome and marked depression and anxiety, which was directly related to the injuries sustained during the altercation with Black. Dr. Helgeson countered that claimant was not suffering from either post-concussion or post-traumatic cervical syndrome.

The question of causation is one of fact for the Commission and will not be overturned unless the finding is against the manifest weight of the evidence. (*Interlake, Inc. v. Industrial Comm'n* (1987), 161 Ill. App. 3d 704, 515 N.E.2d 202.) A reviewing court may overturn the Commission's factual determinations only when they are

against the manifest weight of the evidence. (*Anderson Clayton Foods v. Industrial Comm'n*, 171 Ill. App. 3d at 459, 526 N.E.2d at 846.) Based upon the facts in this case, the Commission's decision that claimant's present condition is the result of the work-related altercation with Black is adequately supported by the evidence.

■■ Employer finally contends that the Commission's finding of average weekly wage was against the manifest weight of the evidence.

Section 8(b)(1) of the Act provides that the compensation rate for temporary total incapacity shall be equal to 66²/₃% of the employee's average weekly wage, as computed in accordance with section 10. That section provides in relevant part:

"The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement *excluding overtime*, and bonus divided by 52; but if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 48, par. 138.10.

In claimant's amended request, he stated that his average weekly wage is $929.16. Claimant testified at the arbitration hearing that he earned between $16 and $18 per hour, and that he worked 58 hours per week in the current construction season prior to his injury in April 1988. Claimant worked a similar number of hours in the previous construction season ending in November 1987. The Commission determined that claimant was entitled to $554.27 per week for a period of 31⁴/₇ weeks, representing the maximum weekly rate for temporary total disability benefits. Thus, it is apparent that the Commission included claimant's 58 hours per week in calculating the average weekly wage.

Under section 10, overtime wages, bonuses and unemployment compensation are not considered in calculating average weekly wages, even though as a practical matter they account for a significant part of many seasonal workers' annual incomes which benefit the employer. (*Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n* (1989), 180 Ill. App. 3d 885, 536 N.E.2d 1008.) Offsetting those deductions is the

lost-time deduction, which allows the Commission to calculate average weekly wages using a denominator of only those weeks actually worked, to the benefit of the employee. *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 893, 536 N.E.2d at 1014.

This court most recently interpreted section 10 in *Edward Hines Lumber Co. v. Industrial Comm'n* (1990), 215 Ill. App. 3d 659. That case is factually distinguishable from this case, for it concerns a non-seasonal worker who worked under a union contract that provided that he had to work whatever hours the employer demanded, with the minimum number of hours set at approximately 10 per day six days a week. However, this court reiterated the principles set forth in *Illinois-Iowa Blacktop*, finding that with respect to seasonal workers, overtime wages are not considered in calculating average weekly wages.

It is undisputed that the claimant in this case was a seasonal worker. Claimant worked from September through November 1987, until the onset of inclement weather halted the construction season. Claimant held no other job until he resumed employment during the spring of 1988 when the current construction season began.

Applying the principles set forth in *Illinois-Iowa Blacktop* for seasonal workers such as the claimant in this case, we find that it was error for the Commission to have included claimant's overtime wages in its average weekly wage calculation. Therefore, we remand the cause for determination of claimant's average weekly wage based upon his non-overtime hours.

For the foregoing reasons, the judgment of the circuit court of Tazewell County awarding claimant temporary total disability and medical benefits is affirmed. That portion of the order which pertains to claimant's average weekly wage is reversed for recalculation pursuant to these holdings. Judgment affirmed in part; remanded in part.

Judgment affirmed in part; remanded in part.

McCULLOUGH, P.J., WOODWARD, STOUDER, and LEWIS, JJ., concur.