THE CITY OF CHICAGO, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Carl Powell, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—06—2206WC

Opinion filed May 29, 2007.

James W. Lowry, of Hennessy & Roach, P.C., of Chicago, for appellant.

Joseph J. Spingola, of Chicago, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Claimant, Carl Powell, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1994)), asserting that on January 3, 1995, he sustained a compensable accident while working as a pipe fitter for respondent, the City of Chicago (respondent or City). Ultimately, the Illinois Workers' Compensation Commission (Commission) awarded claimant 78³/₇ weeks of temporary total disability benefits (see 820 ILCS 305/8(b)

(West 1994)) and 263⁶/₇ weeks of maintenance (see 820 ILCS 305/8(a) (West 1994)). The Commission also awarded claimant permanent total disability (PTD) benefits for life (see 820 ILCS 305/8(f) (West 1994)) as an "odd lot." Respondent appeals, arguing that the Commission erred in finding that claimant was entitled to PTD benefits under the odd-lot theory. We affirm.

## I. BACKGROUND

The arbitration hearing on claimant's application for adjustment of claim was held over two dates in August and October 2001. At the hearing, claimant testified that after completing high school, he worked for a "pipe covering outfit" for two years. In 1968, at the age of 21, claimant began an apprenticeship program with the Pipe Fitters' Association. The apprenticeship lasted five years. Throughout his apprenticeship, claimant worked for one contractor. After completing the apprenticeship, claimant worked for the same contractor for an additional five years. At some point, claimant was a reservist in the Illinois National Guard for six years. Claimant testified that he served as an infantryman, but received no particular training. Claimant also testified that he owned a nine-unit apartment building.

In June 1978, claimant began working for respondent as a journeyman pipe fitter. Claimant's position with respondent involved climbing and scaffold work. Claimant testified that the accident at issue occurred on January 3, 1995. On that date, claimant had been assigned to restore a heating unit located on the roof of the Chicago Cultural Center. Claimant testified that as he was exiting the heating unit, he placed his left leg out on the roof for leverage and grabbed onto something to lift himself out. In doing so, claimant's left leg slipped and he fell backwards out of the heating unit. Claimant hit his head and shoulders and his right leg became "tangled" inside the heating unit. Claimant experienced pain throughout his body, but continued to work that day.

On January 6, 1995, claimant sought medical treatment for his injury at Mercy Works. At that time, claimant complained of an injury to the right knee. According to claimant, he did not have any knee problems prior to the accident. Claimant was given some elastic bandages and medication and told to see an orthopaedic surgeon. Claimant continued working at that time. An MRI of claimant's right knee was performed on January 24, 1995. The MRI showed degenerative changes and a horizontal tear of the posterior horn of the medial meniscus. At a follow-up visit at Mercy Works early in February, the attending physician placed claimant on limited duty with no lifting more than 30 pounds, no repeated stooping or squatting, and no climbing.

While continuing to treat at Mercy Works, claimant also began seeing Dr. Dennis Gates, an orthopaedic surgeon. Following an examination on February 8, 1995, Dr. Gates diagnosed "[i]nternal derangement of both knees—bilateral torn menisci with bilateral Baker's cysts." Dr. Gates recommended arthroscopy of both knees and authorized claimant off work. Dr. Gates performed the recommended procedure on February 20, 1995, and claimant began a course of physical therapy. After the surgery, claimant continued to complain of pain and swelling in both knees. In response, Dr. Gates administered a cortisone injection to the left knee. Claimant testified that the injection did not provide any relief. Dr. Gates then instructed claimant to walk using a cane. Because of claimant's continued complaints, Dr. Gates recommended a second surgical procedure. On July 12, 1995, Dr. Gates opined that claimant "ha[d] just about reached maximum medical improvement and that his prognosis is pooor [sic] for returning to his job as a laborer." Dr. Gates also recommended that claimant "look into a job where he is not on his legs." On November 6, 1995, claimant underwent a second procedure on his right knee. Claimant testified that his condition did not improve after the second surgery. On January 25, 1996, claimant saw Dr. Gates after his knee "buckled" and he fell down a couple of stairs at his home. In response, Dr. Gates prescribed a hinged knee brace for claimant's right knee and instructed claimant to continue using a cane. Dr. Gates believed that claimant would eventually need to have both knees replaced and that he would be unable to work as a pipe fitter. Dr. Gates also recommended the following restrictions: no climbing, no lifting in excess of 20 pounds, no running, no prolonged standing or walking, and no walking without a cane for any distances.

Claimant visited Dr. Bush Joseph, an orthopaedist, for a second opinion on March 13, 1996. Following a physical examination, Dr. Bush Joseph's impression was bilateral medial compartment arthrosis. During the examination, claimant told Dr. Bush Joseph that he is "totally disabled regarding any attempts at labor or work." Dr. Bush Joseph stated that claimant "does seem functionally quite disabled by his symptoms and little can be offered him in regards to treatment." Dr. Bush Joseph opined that claimant may eventually consider a total knee replacement.

On June 25, 1996, claimant presented for a functional capacity evaluation (FCE) per a recommendation by Dr. Gates. After conducting a pre-FCE musculoskeletal evaluation, the physical therapist noted that claimant's pain limited his functional abilities. As a result, it was deemed "risky" to have claimant perform weight-bearing resistive activities, and the FCE was not attempted. On August 7, 1996, medi-

cal personnel at Mercy Works opined that claimant had reached maximum medical improvement (MMI) and claimant was discharged from their care. Claimant continued to see Dr. Gates intermittently through at least May 1997, with complaints of back "troubles" as well as hip and knee pain. Dr. Gates asked claimant to consider a total replacement of both knees and reiterated that claimant could not return to work as a pipe fitter.

Claimant was examined by Dr. Samuel Chmell on July 15, 2000, at the request of his attorney. Dr. Chmell examined claimant and reviewed claimant's medical records. Dr. Chemell's diagnosis was threefold: (1) torn medial meniscus both knees; (2) "[t]raumatic exacerbation" of degenerative arthritis of both knees; and (3) Baker's cyst both knees secondary to claimant's other two conditions. Dr. Chmell classified the condition of ill-being as "permanent" and indicated that claimant would eventually require a total replacement of both knees. Dr. Chmell added that "[w]ith or without these knee replacements, [claimant] can never return to the type of work he was doing before. The only type of work that would be a consideration for him would be a sedentary job." In September 2000, claimant was examined by Dr. Schlamberg, an orthopaedic surgeon. Dr. Schlamberg gave claimant a work status report indicating that claimant would be unable to return to work as a pipe fitter.

At respondent's request, claimant was examined at Mercy Works in September 2000 and in August 2001. On both occasions, claimant was given a work status discharge sheet. The discharge sheet issued in September 2000 indicated that claimant could return to work with various restrictions, including no lifting more than five pounds, ground-level work only, minimal walking, and no kneeling or bending. Claimant tendered the sheet to his supervisor, who signed the sheet and wrote "NO! CANNOT USE THIS EMPLOYEE." The August 2001 discharge sheet indicated that claimant could return to work, ground-level only, with minimal walking, no climbing, and no kneeling or bending. The sheet also indicated that claimant had reached MMI.

Claimant acknowledged that since the time of his injury in 1995, he has not tried to find a job on his own and that he has not updated his resume. He also stated that between 1996 and May 2001, respondent has never indicated that it had a job for him. However, claimant did admit meeting with respondent. Introduced into evidence were four letters asking claimant to report for an appointment "to provide [claimant] with an opportunity for Vocational Rehabilitation" in the City's "Work Training/Work Experience" program. The letters are dated March 24, 1998, September 21, 1999, March 2, 2001, and May 24, 2001. Also introduced into evidence is a letter from respondent dated May 23, 2001, scheduling an interview with Russell Baggett.

Claimant testified that he did not remember interviewing with respondent in May 1998 and he did not recall seeing the letter dated September 21, 1999. Walter O'Grady, an employee with respondent's committee on finance, recalled that respondent attempted to place claimant in a program to provide vocational rehabilitation. According to O'Grady, these programs can lead to a full-time position. No one testified regarding whether claimant attended the meeting referenced in the May 1998 letter. Although O'Grady did recall attending a meeting with claimant in response to the September 1999 letter, no details about that meeting were provided.

Claimant acknowledged that he did not attend the meeting scheduled for March 2001. However, he did meet with Baggett on May 29, 2001. Baggett testified that after interviewing an applicant, he reviews a list of job titles and determines which ones the individual is qualified for. If the individual is placed on an eligibility list, it is up to the individual department to select candidates to interview for a particular position. With respect to claimant's interview, Baggett noted that claimant did not bring a copy of his resume as requested. During the interview, claimant told Baggett that the interview process was a "waste of time" and that medical personnel told him that, physically, he could not do any work. Nevertheless, Baggett searched for a sedentary job for claimant. Baggett considered several positions for claimant including that of a watchman, a unit assistant, and an administrative assistant. Ultimately, Baggett placed claimant on two eligibility lists: administrative assistant 2 and watchman. According to Baggett, claimant never mentioned that he owned a building. Baggett testified that, had he possessed such information, it could have potentially opened up additional job opportunities for claimant in the real-estate arena. Baggett admitted that in the five months since he interviewed claimant, claimant had yet to be placed.

Claimant and O'Grady met again at the meeting referenced in the May 24, 2001, letter. At that meeting, the parties discussed the "Work Training/Work Experience" program. According to claimant, he was told that he was being considered for a job watching a water fountain. O'Grady testified that claimant was being considered for a job with the water department, but denied that it involved watching a water fountain. O'Grady recalled that during the meeting, claimant's attorney stated that claimant's workers' compensation case would be up in a relatively short period of time and that claimant would be requesting that the Commission award claimant "total permanent." O'Grady responded that if that were the case, there was no point in proceeding with the interview. O'Grady testified that but for the representation that claimant was permanently and totally disabled, the meeting with

the water department would have taken place. Claimant testified that he has not heard anything else about the position since that meeting.

Claimant also met with two vocational rehabilitation counselors: Susan Entenberg, who testified at claimant's request, and Carl Triebold, who testified at respondent's request. Entenberg interviewed claimant on September 7, 2000. At the time of the evaluation, claimant was 53 years old. Claimant provided Entenberg with a work history. He also told her that he spends his day watching sports, cooking "for short periods," and going to the grocery store "to pick up small items." Claimant also stated that he can walk the dog "for one block" and that, during the summer, he does statistics for a softball league. Claimant reported that he does no cleaning, laundry, or maintenance, and that he has no computer skills. Entenberg asked claimant what he felt he was capable of doing functionally to get an idea of his tolerance. Claimant responded that he could sit for about 20 minutes at a time, stand for very short periods, and walk for about a block. Claimant also told Entenberg that he can lift about five pounds, that his bending was limited, that he could not squat or kneel, that he is able to climb stairs sideways with the assistance of the handrail, and that he is able to drive for about 20 minutes.

After reviewing claimant's medical records and the FCE report, Entenberg conducted a vocational work history of claimant. Entenberg determined that claimant had a work-life expectancy of about 12 years. Entenberg learned that claimant had been a pipe fitter his entire career, a position she classified as "heavy." According to Entenberg, a pipe fitter would not have any skills transferable to a sedentary or light occupation. Entenberg concluded that claimant would definitely not be able to work as a pipe fitter job because of the heavy work involved and the restrictions placed on him by medical personnel. In addition, Entenberg opined that claimant would not be capable of obtaining any other gainful employment because of his physical restrictions. She noted that claimant was not even able to complete the FCE due to severe pain and that Dr. Bush Joseph felt that claimant was "functionally disabled." Entenberg added that even sedentary activity requires the ability to sit for prolonged periods of time and that claimant has problems sitting for any period of time because of pain. Thus, she concluded that claimant is not a good candidate for vocational rehabilitation and that there is no stable labor market for him.

Triebold met with claimant on August 23, 2001, a week before the arbitration hearing. Triebold testified that during the meeting, claimant was evasive and uncooperative. Nevertheless, Triebold was able to complete the evaluation. Based on the job description he developed,

Triebold testified that claimant has transferable skills related to the layout, operation, repair, installation, and maintenance of piping systems and pneumatic equipment; the use of materials and equipment utilized in the performance of those activities; the use of various hand and power tools; and the ability to solder, weld, and glaze. Triebold cautioned that these recommendations are for "sedentary and light" capacity work. Given these "transferable skills," Triebold identified the following positions for claimant: bench welder, pipe repairer, and building systems inspector. Triebold also identified some "unskilled" positions within claimant's work capacity, including a security gate guard, security officer, supervisor, electronics assembler, electronics tester, inspector, and electronics solderer or brazier. Triebold also mentioned potential work as a maintenance scheduler given that claimant owns an apartment building. Accordingly, Triebold concluded that there are positions available for claimant in a stable labor market.

At the arbitration hearing, claimant testified that he still wears a brace on his right knee and has begun wearing one on his left knee per the recommendation of Dr. Gates. Claimant testified that he wears the braces "[a]ny time [he's] going to be doing any kind of walking" and that he has used a cane to walk since 1996. Claimant estimated that he restricts his driving to about 20 miles per week and that he rarely takes public transportation (although he admitted taking rapid transit to Wrigley Field for a baseball game). Claimant testified that during a typical day he may walk his dog for about 15 minutes and watch television, including entire baseball games. During the summer, claimant watches ball games, sometimes keeping score. Claimant also testified that when he does drive it is for short distances, lasting under 20 minutes.

Kevin Read, a private investigator, conducted videotape surveillance of claimant on August 22, 2001, at respondent's request. At approximately 7:31 a.m., Read observed claimant exit his residence and drive away. Claimant was not wearing a knee brace or using a cane when he got into the vehicle. Claimant, who was accompanied by a female subject, drove to a bakery and then to a location in downtown Chicago before returning home. Claimant did not exit the vehicle at any time during the trip, which lasted about 40 minutes. At home, claimant entered the residence for a few minutes before leaving again with his dog. Claimant walked his dog for 14 minutes. After walking the dog, claimant again exited the residence, crossed the street, and briefly talked with some men. Claimant then got into his vehicle and left the area. At no time was claimant wearing knee braces or using a cane.

On rebuttal, claimant testified that he does not wear a knee brace or use his cane all the time when he is out of the house. In particular, claimant stated that he does not use the brace or cane in the mornings and when it is hot out. According to claimant, the location where he is seen walking his dog on the video is only about a half a block from his home. Claimant added that he does not walk the dog every morning.

The arbitrator rendered her decision on February 28, 2002. The arbitrator found that claimant sustained accidental injuries which arose out of and in the course of his employment. However, the arbitrator did not find claimant to be totally and permanently disabled. The arbitrator found the testimony and opinions of Entenberg "speculative," "beyond her expertise," and replete with inaccuracies. The arbitrator found the testimony of Triebold persuasive regarding claimant's ability to acquire employment in a stable labor market that would not be at odds with his limitations. The arbitrator added that "it was clear from [claimant's] behavior that he is unwilling to find himself another job, irrespective of his limitations." Accordingly, the arbitrator found that the nature and extent of claimant's injury is 25% loss of use to the right leg and 25% loss of use of the left leg.

The Commission, with one commissioner dissenting, modified the decision of the arbitrator in part, reversed in part, and affirmed in part. Relevant here, the Commission found claimant permanently and totally disabled as an "odd lot" pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2002)). The findings of the Commission were sparse. Recognizing this, the circuit court, on judicial review, set aside the Commission's decision and remanded the matter with instructions to make findings of fact with respect to the odd-lot factors and support its findings.

On remand, the Commission did not take additional evidence. However, it did affirm its prior decision finding claimant fell within the odd-lot category, and thus that he was permanently and totally disabled. The Commission gave greater weight to the testimony of Entenberg than to Triebold. The Commission characterized Triebold's evaluation as "a last minute attempt on Respondent's part to try to show employment was available to [claimant] within his sedentary capabilities." Moreover, the Commission pointed out that respondent never offered claimant a job in the five years preceding Triebold's interview. In adopting many of Entenberg's conclusions, the Commission emphasized that claimant had a 12-year work-life expectancy; and that claimant's only training, experience, and education had been in the field of pipe fitting, an occupation with few skills transferable to a sedentary position. The Commission discounted claimant's military experience because his service was "non-specific" and occurred more

than 35 years prior. In addition, the Commission gave little weight to claimant's ownership of an apartment building because there was no evidence in the record regarding claimant's role or involvement in the management or maintenance of the property. With respect to the impact of claimant's physical condition on his ability to find work in the competitive labor market, the Commission cited claimant's inability to complete the FCE, claimant's indication to Entenberg that he experienced significant pain with prolonged sitting, and Entenberg's finding that claimant would not be a good candidate for vocational rehabilitation. On judicial review, the circuit court found that there was sufficient evidence in the record to support the Commission's award of PTD benefits under the odd-lot theory. Accordingly, the circuit court confirmed the Commission's decision. This appeal by respondent ensued.

## II. ANALYSIS

■ On appeal, respondent argues that the Commission erred in finding that claimant was permanently and totally disabled under the odd-lot theory. The principles applicable to a finding of permanent and total disability are well settled. An employee is totally and permanently disabled when he is unable to make some contribution to industry sufficient to justify payment of wages to him. *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n*, 77 Ill. 2d 482, 487 (1979). Our supreme court has stressed, however, that the employee need not be reduced to total physical incapacity before a permanent total disability award may be granted. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286 (1983). Rather, the employee must show that he is unable to perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them. *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534 (1996). If the employee's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, he may qualify for "odd-lot" status. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47 (1981). An odd-lot employee is one who, though not altogether incapacitated to work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market. *Valley Mould*, 84 Ill. 2d at 547.

Prior to advancing any further, we find it necessary to clarify the standard of review applicable to a finding of odd lot. According to respondent, whether an employee falls into the odd-lot category presents a question of law subject to *de novo* review. Respondent's argument regarding the appropriate standard of review relies on various cases, including *City of Belvidere v. Illinois State Labor Relations*

*Board*, 181 Ill. 2d 191 (1998), *Valley Mould*, 84 Ill. 2d 538, and *A.M.T.C.*, 77 Ill. 2d 482. Claimant responds that the issue of whether he falls into the odd-lot category is a factual determination to be made by the Commission, and that the Commission's determination will not be set aside unless it is against the manifest weight of the evidence. We agree with claimant.

Respondent's assertion that we review this matter *de novo* appears to stem from confusion regarding the burden of proof in odd-lot cases. The burden of proof is "[a] party's duty to prove a disputed assertion or charge." Black's Law Dictionary 190 (7th ed. 1999). The burden of proof consists of both the "burden of persuasion" and the "burden of production." *Schuttler v. Ruark*, 225 Ill. App. 3d 678, 684 (1992); see also Black's Law Dictionary 190-91 (7th ed. 1999) (defining "burden of proof"). The burden of persuasion, which has been defined as "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party" (Black's Law Dictionary 190 (7th ed. 1999)), remains with the same party throughout a proceeding (see *Pochopien v. Regional Board of School Trustees of Lake County Educational School Region*, 322 Ill. App. 3d 185, 193 (2001)). In proving odd-lot status, the employee carries the burden of persuasion.

While the burden of persuasion remains with the same party throughout a case, the burden of production shifts. See *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006) (discussing burden of production with respect to summary judgment); *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 6-7 (1996) (allocating burden of production in an odd-lot case). Normally, the party with the initial burden of production must merely make out a *prima facie* case to shift the burden of production. See *Board of Education of the City of Chicago v. Cady*, 369 Ill. App. 3d 486, 495 (2006) (invoking indirect method of proof in unlawful discrimination case); *People v. Roberson*, 367 Ill. App. 3d 193, 196 (2006) (applying burden-shifting analysis to a motion to suppress evidence). A *prima facie* case is made when the party with the initial burden has presented at least some evidence on all the necessary elements to establish the underlying cause of action. *Cuculich v. Thomson Consumer Electronics, Inc.*, 317 Ill. App. 3d 709, 717 (2000); see also *Lanter Courier*, 282 Ill. App. 3d at 6 (defining a *prima facie* case as one in which the party with the initial burden "produce[s] sufficient evidence so that a finding in that party's favor could be supported if contrary evidence were ignored"); Black's Law Dictionary 190 (7th ed. 1999) (defining "burden of production" as "[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder"). The failure of the party with the initial burden to make out a *prima facie* case requires the trial court

to rule for the opposing party as a matter of law. *Cuculich*, 317 Ill. App. 3d at 717; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §301.4 (8th ed. 2004). Matters of law are subject to *de novo* review. *Aon Corp. v. Utley*, 371 Ill. App. 3d 562, 567 (2006).

In this case, respondent asserts that claimant did not present sufficient evidence of odd lot to shift the burden of production. For this reason, it urges us to review *de novo* the Commission's finding of odd lot. However, the burden-shifting analysis applicable to an odd-lot case is different. While several cases from this court discuss odd lot in terms of requiring the employee to make a *prima facie* case of odd lot prior to having the burden shift to the employer to produce evidence that some type of regular and continuous employment is available to the employee (see *Meadows v. Industrial Comm'n*, 262 Ill. App. 3d 650, 654 (1994); *Old Ben Coal Co. v. Industrial Comm'n*, 261 Ill. App. 3d 812, 814 (1994); *Boyd v. Industrial Comm'n*, 127 Ill. App. 3d 1023, 1030 (1984)), we recently clarified that an employee seeking odd-lot status "must do more than make a *prima facie* case" to shift the burden to the employer. *Lanter Courier*, 282 Ill. App. 3d at 6. Indeed, it has been held that with respect to the burden of production, the employee must "initially establish[ ]" *by a preponderance of the evidence* that he falls within the odd-lot category. *Valley Mould*, 84 Ill. 2d at 547; *Lanter Courier*, 282 Ill. App. 3d at 6. Ordinarily, the employee satisfies this burden either by presenting evidence of a diligent but unsuccessful attempt to find work or by showing that because of his age, skills, training, experience, and education, he will not be regularly employed in a well-known branch of the labor market. *Alano*, 282 Ill. App. 3d at 538 (Colwell, J., specially concurring). Whether the employee has successfully carried this burden presents a question of fact for the Commission to determine. *Lanter Courier*, 282 Ill. App. 3d at 6; see also *City of Green Rock v. Industrial Comm'n*, 255 Ill. App. 3d 895, 902 (1993). This makes sense as the preponderance-of-the-evidence standard requires the trier of fact to weigh the evidence presented by the parties and to find for the party who, overall, has the stronger evidence. See Black's Law Dictionary 1201 (7th ed. 1999) (defining "preponderance of the evidence"). Only after the employee establishes by a preponderance of the evidence that he falls into the odd-lot category does the burden of production shift to the employer to show that the employee is employable in a stable labor market and that such a market exists. See *Valley Mould*, 84 Ill. 2d at 547; *Waldorf Corp. v. Industrial Comm'n*, 303 Ill. App. 3d 477, 484 (1999). The question whether the employer has satisfied its burden also presents a question of fact for the Commission. *Alano*, 282 Ill. App. 3d at 538 (Colwell, J., specially concurring).

Neither *Valley Mould* nor *A.M.T.C.* supports the application of the standard of review respondent espouses. In fact, in neither of those cases did the supreme court expressly address the standard of review applicable to odd-lot cases. In both of those cases, the supreme court reversed a finding of odd lot on the basis that the employees therein failed to satisfy their burden of production regarding their training, skills, or experience. *Valley Mould*, 84 Ill. 2d at 547-48; *A.M.T.C.*, 77 Ill. 2d at 488-90. In *Valley Mould*, for instance, the only evidence the employee presented in support of his claim of odd-lot status was his age, the fact that he had been working for the employer for 3½ years at the time of the accident, and that he converses in Spanish rather than English. *Valley Mould*, 84 Ill. 2d at 548. In *A.M.T.C.*, the employee presented the following evidence in support of his claim of odd lot: (1) he was 45 years old; (2) he worked for the employer full time for seven years prior to the injury and part time for six years prior to becoming a full-time employee; (3) he was only educated up to the eighth grade; and (4) he performed other, unspecified work. *A.M.T.C.*, 77 Ill. 2d at 489-90. Although the supreme court did not expressly so hold, we interpret *Valley Mould* and *A.M.T.C.* as finding that the employees therein did not prove by a preponderance of the evidence that they fell into the odd-lot category. As we discuss more in depth below, claimant in this case presented more evidence in support of his claim of odd-lot status than just his age, education, and the length of time he worked for respondent. In addition, unlike the employees in *Valley Mould* and *A.M.T.C.*, claimant in this case consulted with and presented testimony from a vocational rehabilitation counselor.

Respondent also relies on *City of Belvidere*, 181 Ill. 2d 191. Purportedly quoting *City of Belvidere*, respondent asserts that our supreme court has stated that " 'the Commission's Decision [*sic*] on the legal question of whether or not [an employee] falls under the odd-lot category of permanent total disability, is not binding on this court.' " After reviewing *City of Belvidere* we are unable to find this passage anywhere in the decision. This is not surprising given the fact that *City of Belvidere* is not an odd-lot case. Indeed, it is not even a workers' compensation case. We admonish respondent's counsel for citing to nonexistent language. Moreover, while *City of Belvidere* does contain a well-developed discussion of various standards of review, respondent does not explain how these ideas apply here. As a result, we do not find respondent's reliance on *City of Belvidere* persuasive.

In sum, only where an employee proves by a preponderance of the evidence that he falls into the odd-lot category does the burden of production shift to the employer to demonstrate that the employee is employable in a stable labor market and that such a market exists.

Whether the parties satisfy their respective burdens are questions of fact. "In deciding issues of fact, it is the function of the Commission to determine the weight to be given to the evidence, judge the credibility of the witnesses, and resolve conflicting medical evidence." *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 860-61 (2005). That it is within the province of the Commission to resolve questions of fact is, after all, not unexpected given the Commission's role as the "ultimate decisionmaker" in workers' compensation cases. *Roberson v. Industrial Comm'n*, 225 Ill. 2d 159, 173 (2007). A reviewing court will not disturb the Commission's determination on a question of fact unless it is against the manifest weight of the evidence. *J.S. Masonry, Inc. v. Industrial Comm'n*, 369 Ill. App. 3d 591, 599 (2006). For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Piasa Motor Fuels v. Industrial Comm'n*, 368 Ill. App. 3d 1197, 1202 (2006). With these principles firmly in mind, we now address whether the Commission's decision that claimant sufficiently proved by a preponderance of the evidence entitlement to odd-lot status is against the manifest weight of the evidence.

As noted, it is respondent's position that the Commission erred in finding that claimant satisfied his burden of producing sufficient evidence to prove odd-lot status. Respondent complains that claimant did not perform any job search and that he failed to establish that because of his age, training, education, skills, and experience he is unfit to perform any but the most menial of tasks for which no stable labor market exists. In finding to the contrary, respondent faults the Commission for giving more weight to the testimony of Entenberg (claimant's vocational rehabilitation counselor) than to Triebold (respondent's vocational rehabilitation counselor). Respondent identifies what it characterizes as various inaccuracies in Entenberg's evaluation. In addition, respondent posits that Entenberg's evaluation was contradicted by the surveillance tape, the testimony of respondent's personnel, and Triebold.

■ In this case, claimant does not dispute that he is not obviously unemployable. Furthermore, the medical evidence regarding whether claimant is permanently and totally disabled from work is inconclusive. For instance, Dr. Bush Joseph wrote in his report that claimant "does seem functionally quite disabled by his symptoms and little can be offered him in regards to treatment." However, Dr. Bush Joseph did not state that claimant was permanently and totally disabled. Furthermore, he was not called to testify and the meaning of this statement was contested at the arbitration hearing. Entenberg interpreted Dr. Bush Joseph's remark to mean that claimant could not be released to

work. In contrast, Triebold interpreted the report as finding that, based on claimant's reported symptoms, claimant believes that he is functionally disabled.

An examination of the remaining medical evidence does nothing to clarify the matter. Dr. Gates, claimant's principle treating physician, acknowledged that claimant would be unable to return to work in his "previous occupation." Dr. Gates does not appear to have ruled out all types of work, however, as he recommended various restrictions, including no climbing, no lifting in excess of 20 pounds, no running, and no prolonged standing or walking. In addition, claimant presented for an FCE. After conducting a pre-FCE musculoskeletal evaluation, the physical therapist noted that claimant's pain limited his functional abilities. As a result, it was deemed "risky" to have claimant perform weigh-bearing resistive activities, and the FCE was not attempted. In June 2000, more than five years after injuring himself, claimant was examined by his independent medical expert, Dr. Chmell. Dr. Chmell characterized claimant's condition of ill-being as "permanent" and that he would eventually need both knees replaced. But Dr. Chmell also opined that "the only type of work that would be a consideration for him would be a sedentary job." In other words, while the evidence demonstrates that claimant is disabled, whether claimant is totally and permanently disabled is unclear. Given the state of the record, it was incumbent upon claimant to establish that he falls into the odd-lot category.

As noted above, claimant may establish odd-lot status in one of two ways. Claimant could have presented evidence of a diligent but unsuccessful attempt to find work. *Alano*, 282 Ill. App. 3d at 538 (Colwell, J., specially concurring). However, at the arbitration hearing, claimant acknowledged that since the time of his injury, he had not attempted to find a job on his own and he did not bother to update his resume. The only other way for claimant to demonstrate odd-lot status was for him to show that because of his age, skills, training, experience, and education, he will not be regularly employed in a well-known branch of the labor market. See *Alano*, 282 Ill. App. 3d at 538 (Colwell, J., specially concurring).

Respondent claims that there is nothing about claimant's age that would prevent him from performing any "useful services." Respondent also posits that claimant's education, training, and skills demonstrate that there are a multitude of professional opportunities available to claimant, including positions as a security officer, watchman, professional driver, or real estate manager. The Commission, however, found otherwise, and we cannot say that a decision opposite to the one reached by the Commission is clearly apparent.

At the time of the arbitration hearing, claimant was a 54-year-old high-school graduate who had worked his entire adult career as a pipe fitter. It was clear from the testimony at the arbitration hearing that claimant would never be able to return to his position in that field of work. While claimant testified that he served as an infantryman in the National Guard and that he owned a nine-unit apartment building, there was no indication that these experiences prepared claimant for regular employment in a well-known branch of the labor market. Claimant testified that he did not receive any particular training while in the National Guard and there was no evidence regarding the extent of claimant's role, if any, in the management and maintenance of the apartment building.

Moreover, while Entenberg testified that claimant had a 12-year work-life expectancy, she found that claimant possessed few transferable skills that would translate into a sedentary-type position. Entenberg went so far as to opine that claimant would be unable to find work in the competitive labor market. In support of this position, Entenberg stressed the decision to abort claimant's FCE on the basis of the musculoskelatal evaluation. She also noted that, while not restricted by his physicians, claimant indicated that he would have significant pain with prolonged sitting. As a result, Entenberg did not find claimant to be a good candidate for vocational rehabilitation.

In contrast to Entenberg's testimony was that of Triebold, respondent's vocational rehabilitation counselor. Based on his evaluation, Triebold determined that claimant possessed various skills that would transfer to sedentary and light-capacity work, including skills related to the layout, operation, repair, installation, and maintenance of piping systems and pneumatic equipment as well as the ability to use various hand tools and to solder, weld, and glaze. In accordance with these findings, Triebold identified various positions to which claimant would be suited, including a bench welder, pipe repairer, and building systems inspector. Triebold also identified some "unskilled" positions within claimant's work capacity and mentioned potential work as a maintenance scheduler based on claimant's ownership of an apartment building.

The Commission found the testimony of Entenberg more persuasive than that of Triebold. The Commission discounted Triebold's opinions, concluding that his involvement in the case just one week prior to the arbitration hearing "constituted a last minute attempt on Respondent's part to try to show employment was available to [claimant] within his sedentary capabilities." It is the function of the Commission to determine the weight to be given to the evidence, judge the credibility of the witnesses, and resolve conflicting evidence, and the

Commission's findings on such matters will not be disturbed unless they are against the manifest weight of the evidence. *Boyd Electric*, 356 Ill. App. 3d at 860-61. Based on the evidence of record, we cannot say that the Commission's decision to favor Entenberg's findings was against the manifest weight of the evidence.

Respondent acknowledges that the Commission generally resolves any conflicts in the evidence. However, respondent notes that the arbitrator found Entenberg's testimony "speculative" and "beyond her expertise" and that she characterized Entenberg's report as inaccurate. Respondent points out that Entenberg analyzed claimant's duties using the wrong occupational definition, she misquoted a "critical" statement from Dr. Bush Joseph's report, she wrongly documented the number of years that claimant worked as a pipe fitter, she failed to learn that claimant owned an apartment building, and she found that claimant could sit for no longer than 20 minutes. According to respondent, Entenberg's findings were contradicted by the surveillance tape, the testimony of respondent's personnel, and Triebold, respondent's vocational rehabilitation expert.

We first point out that in determining whether the claimant has met his burden of proof on an issue, the Commission is not bound by the arbitrator's findings and may properly determine the credibility of witnesses, weigh their testimony and assess the weight to be given to the evidence. *R.A. Cullinan & Sons v. Industrial Comm'n*, 216 Ill. App. 3d 1048, 1054 (1991). The reason for this is because when the Commission reviews an arbitrator's decision, it exercises original and not appellate jurisdiction, regardless of whether the Commission hears additional evidence. *Franklin v. Industrial Comm'n*, 211 Ill. 2d 272, 279 (2004); *Messamore v. Industrial Comm'n*, 302 Ill. App. 3d 351, 356 (1999). Further, we concluded that the "inaccuracies" identified by claimant in Entenberg's report would not warrant reversal in this case.

Entenberg admittedly copied *verbatim* from the Dictionary of Occupational Titles the duties of a pipe fitter. Claimant testified that his position with respondent did not entail all the functions Entenberg listed in her definition. However, claimant's position did involve some of the listed functions. Moreover, regardless of the exact nature of claimant's duties, it was not seriously disputed that claimant's position as a pipe fitter was "heavy" and that he was not fit to work as a pipe fitter. Therefore, the fact that Entenberg may have considered job functions that claimant did not actually perform is of little significance. Likewise, we do not find significant the fact that Entenberg misquoted Dr. Bush Joseph's statement. Entenerg's report omitted the word "quite" when discussing Dr. Bush Joseph's opinion regarding the

extent of claimant's disability. In its entirety, the statement reads "the patient does seem functionally *quite* disabled by his symptoms and little can be offered him in regards to treatment." (Emphasis added.) However, the Commission was aware of this omission as it was brought out during Entenberg's and Triebold's testimony.

Respondent's other arguments are no more persuasive. Respondent points to nothing in particular about the error Entenberg made regarding the number of years claimant worked as a pipe fitter that would require reversal. In fact, it remains undisputed that for most of claimant's adult life he earned a living principally as a pipe fitter. Further, while Entenberg was unaware that claimant owned an apartment building, there was no evidence regarding claimant's role in the management or maintenance of the building. Therefore, respondent's suggestion that claimant has experience in the real estate field puts the proverbial cart before the horse. With respect to the surveillance videotape, the video we have been provided shows claimant walking his dog for five minutes. Claimant appears to be having difficulty. He waddles, swaying from side to side as he walks. Moreover, claimant acknowledged during his testimony and to Entenberg that he walks his dog. The Commission apparently found that the evidence on the videotape did not overcome the medical evidence, and we cannot disagree. In sum, as all of the matters cited by respondent for disregarding Entenberg's testimony go to weight and credibility, they were within the province of the Commission to decide.

We also point out that there was additional evidence supporting Entenberg's finding that claimant would be unable to find work in the competitive labor market. Although claimant made no attempt to search for a job on his own, he did attend various interviews scheduled by respondent. While respondent argued that claimant hindered the interview process through various tactics, claimant did attend the meetings and he was placed on at least two eligibility lists. Nevertheless, respondent never offered claimant a position. Respondent's failure to offer claimant any position buttresses Entenberg's opinion that claimant would be unable to find work in any field.

Prior to concluding, we address one additional matter. Respondent chides the Commission for failing to reopen the proofs and take new evidence upon remand from the circuit court. However, respondent cites to no rule or case law requiring the Commission to do so. In fact, this court has held that, in the absence of a directive from the remanding court, it is within the discretion of the Commission whether to hear additional evidence on remand. *Pecyna v. Industrial Comm'n*, 149 Ill. App. 3d 97, 102 (1986). In this case, the circuit court did not require the Commission to hear additional evidence. Instead, the court

instructed the Commission to "make findings of fact in respect to the odd-lot factors and cite the evidence and give reasons in support of those findings." The Commission complied with the circuit court's ruling. Accordingly, we find no error.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the circuit court of Cook County, which confirmed the decision of the Commission.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and DONO-VAN, JJ., concur.